# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNY ANDERSON,       )
                                 )
       Plaintiff,         )       Civil Action No. 3:13-cv-135
                                 )
       v.               )
                                 )       Judge Kim R. Gibson
UNITED PARCEL SERVICE, INC.,  )
                                 )
       Defendant.       )
                                 )

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Penny Anderson ("Plaintiff") has filed this civil action against her former employer, Defendant United Parcel Service, Inc. ("UPS" or the "Company"), alleging violations of the Family Medical Leave Act of 1993, as amended, 29 U.S.C. §2601 *et seq.* ("FMLA"), as well as gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. §951 *et seq.* ("PHRA").[1] Pending before the Court is a motion for summary judgment (ECF No. 28) filed by Defendant. For the reasons that follow, Defendant's motion for summary judgment will be granted as to all counts in the complaint.

---

[1] For present purposes, Plaintiff's state law claim under the PHRA is identical to her federal claim under Title VII. *See Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 567 (3d Cir. 2002) ("[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."). Accordingly, for the sake of simplicity, the Court will address only Plaintiff's Title VII claim in connection with her allegations of gender discrimination, but our analysis of the Title VII claim will apply in all respects to her PHRA claim as well. *See Goosby v. Jonson & Johnson Med., Inc.,* 228 F.3d 313, 317 n.3 (3d Cir. 2000) ("The analysis required for adjudicating [plaintiff's] claim under PHRA is identical to a Title VII inquiry ..., and we therefore do not need to separately address her claim under the PHRA.").

## II. Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331 and §1367. Venue is proper pursuant to 28 U.S.C. §1391(b)(2).

## III. Factual Background[2]

Plaintiff was employed as a Regular Temporary Package Car Driver for UPS in its DuBois, Pennsylvania business center (the "DuBois Center") between September 2006 and February 20, 2012, when she was terminated from her job. (CSUMF ¶11; Pl.'s Dep. 14-16, ECF No. 31-1.)[3] Plaintiff's job was a part-time, on-call position, which required her to call UPS every morning and fill in as needed whenever a full-time package car driver on one of her assigned routes was absent from work. (Pl.'s Dep. 16-17, 28-29, 32; CSUMF ¶¶11-12.) On days when Plaintiff was not needed for a delivery route assignment, she had the opportunity to work inside the DuBois Center handling package sorting duties, which are referred to as the "local sort." (Pl.'s Dep. 15-16; CSUMF ¶¶12-13.) Plaintiff preferred not to work the local sort job and, per her request, the Company skipped over her and offered that work, as available, to lower seniority employees. (CSUMF ¶13.)

Each UPS business center, including the DuBois Center, is run by a manager (the "Center Manager"), below whom are full-time and part-time supervisors. (CSUMF ¶2.) Between 2006 and 2011, the DuBois Center was managed by David Waters. (*Id.* ¶14.) In September 2011,

---

[2] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[3] All citations to "CSUMF ___" refer to the Defendant's Concise Statement of Undisputed Material Facts (ECF No. 29) and Plaintiff's responses thereto (ECF No. 34). Citations to deposition testimony refer to the original pagination found internally in the body of the transcript rather than the official CM/ECF pagination appearing in the document's header.

Melissa Davis became the Center Manager. (*Id.*) At times relevant to this lawsuit, Henry Ho served as the full-time dispatch supervisor, and Josh Crabb was a part-time nighttime supervisor who managed the evening local sort. (Pl.'s Dep. 22-23.)

The majority of the hourly employees at the various UPS business centers are members of a collective bargaining unit represented by the International Brotherhood of Teamsters. (CSUMF ¶3.) During her tenure with UPS, Plaintiff was a member of the Teamsters' Union No. 110 (the "Union"), and her employment was governed by the terms and conditions of a collective bargaining agreement between the Union and UPS. (CSUMF ¶¶ 3,11.) This agreement, known as the National Master United Parcel Service Agreement and Western Pennsylvania Supplemental Agreement (the "Labor Agreement"), governed UPS's operations in Western Pennsylvania, including its operations at the DuBois Center. (CSUMF ¶3.)

The Preamble to Article 18 of the Labor Agreement expresses the parties' mutual acknowledgment that "the safety of the employees and the general public is of utmost importance." (CSUMF ¶5.) To that end, the Labor Agreement sets forth various provisions "to respond to that mutual concern for safety," (*id.*), including the following language at Section 3:

> Any employee involved in any accident shall immediately notify the Employer.
>
> When required by the Employer, the employee, before the end of the employee's shift, shall complete a report of the accident including all available names and addresses of witnesses to the accident.

(CSUMF ¶5.) An accident is defined by UPS as "any occurrence in which our vehicle is, in any way, involved and which results in personal injury or property damage, no matter how slight." (*Id.*)

Failure to report an accident is considered by UPS to be a dishonest act, and dishonesty, in turn, is recognized in the Labor Agreement as a cardinal offense warranting automatic

termination. (CSUMF ¶8.) Included in the record are numerous arbitration decisions from Western Pennsylvania holding that the failure of a UPS driver to promptly report an accident constitutes just cause for termination irrespective of the extent of the damage. (*See UPS and Teamsters Local 110* (McPherson, 2009) (concerning an accident by male driver at UPS's Johnstown, Pennsylvania facility); *UPS and Teamsters Local Union No. 30* (Miles, 2007) (accident involving male driver at UPS's New Stanton, Pennsylvania facility); *UPS and Teamsters Local 30* (Zobrak, 2006) (involving male UPS driver in Greensburg, Pennsylvania); and *UPS and Teamsters Local 30* (Zobrak, 2001) (involving male UPS driver in Belle Vernon, Pennsylvania), reported at Def.'s Ex. I, Tabs 1-4, ECF Nos. 31-15 and 31-16.)

UPS provides training and periodic reminders to its drivers as to their accident reporting requirements, including the multiple ways that a driver can report an accident incurred during the course of a workday. (CSUMF ¶6.) UPS issues cell phones to its drivers in order to communicate with the Business Center. In addition, drivers can also utilize their own personal cell phones for communication purposes. In the absence of cell phone service, a driver can use the DIAD board, which is an on-car system that records information for the driver and is a way for the driver to communicate with the Business Center. Drivers can also use a landline to telephone the center. (*Id.*)

In January 2009, Plaintiff was involved in a "backing accident" that resulted in minor damage to the package car that she was driving. (CSUMF ¶16.) The accident, which UPS determined to be avoidable, resulted in Plaintiff receiving a warning letter and additional training. (*Id.* ¶17.) Because Plaintiff timely and properly reported the accident to management, she was spared a more severe form of discipline such as discharge. (*Id.*) In connection with this accident, Plaintiff received an Accident Review Report stating, in relevant part, that "[a]n

4

accident is defined as any occurrence in which our vehicle is, in any way, involved and which results in personal injury or properly damage, no matter how slight." (Def.'s Ex. A, Pt. 4 at 18, ECF No. 31-4; Pl.'s Dep. 183, ECF No. 34-1.)

In April 2010, Plaintiff underwent back surgery for a degenerative disc condition, which resulted in complications. (Pl.'s Dep. 148-49, ECF No. 31-3.) In April 2011, she began utilizing intermittent leave under the FMLA in order to cover flare-ups and monthly doctor appointments related to her back problems. (*Id.*) Plaintiff claims that, thereafter, Ho began assigning her less desirable routes with more stops, mileage, and/or package volume. (CSUMF ¶82; Pl.'s Dep. 166-67, ECF No. 31-3.)

Plaintiff also contends that, on August 23, 2011,[4] she was off work on an FMLA day when Ho and Crabb advised her that she had to come into work. (CSUMF ¶87; Pl.'s Dep. 157-59, ECF No. 31-3; *id.* at 173, ECF No. 34-1.) Upon reporting to work, Plaintiff had a heated argument with Ho about her right to take leave under the FMLA. (Pl.'s Dep. 173, ECF No. 34-1.) Ho responded that he didn't have enough drivers because others were taking time off. (*Id.* at 174.)

Thereafter, Plaintiff filed a formal complaint with the U.S. Department of Labor ("DOL"). (Pl.'s Ex. G, ECF No. 34-1.) The record shows that the DOL investigator made contact with Linda Mayers, an administrative assistant in UPS's Human Resources Department for Western Pennsylvania, located in New Stanton, Pennsylvania. (Mayers Decl. ¶2, ECF No. 31-14.) Mayers' duties at the time included maintaining records associated with leave requests and the Company's approval or disapproval of such requests. (*Id.* ¶3.) According to Mayers, the

---

[4] Although Plaintiff could not recall the precise date of this incident, her complaint to the Department of Labor reflects that it occurred on August 23, 2011. (Pl.'s Ex. G, ECF No. 34-1.)

DOL investigator indicated that there was an issue regarding Anderson having been denied FMLA leave. (*Id.* at ¶5.) Mayers advised the investigator that Anderson had previously been approved for leave under UPS's leave policy but that she had exhausted her entitlement. (*Id.* ¶5.) According to the DOL documentation submitted by Plaintiff, Mayers informed the investigator that the Human Resource Department did not have any record of Plaintiff requesting leave on August 23, 2011. (Pl.'s Ex. G at p. 4, ECF No. 34-1.) Moreover, the DOL's records state that:

> … [UPS] has a policy that if an employee with at least 36 months service and at least 625 work hours in the previous 12 months, [sic] are eligible for up to 6 weeks under the UPS FMLA policy… [Redacted] did not work the required 1250 hours in Reg. 825.110(a)(2) the 12 month period prior to commencement of leave to start 1/27/2011 therefore was not eligible for FMLA.[5]

(*Id.*) Per the investigator's request, Mayers supplied the DOL a copy of UPS's FMLA policy (Mayer's Decl. ¶5), which Plaintiff admits is more generous than federal law requires. (CSUMF ¶10.) As a result of the DOL's investigation, no FMLA violations were charged. (Pl.'s Ex. G at p. 4, ECF No. 34-1.) Mayers states that she never received any documentation from the DOL concerning Anderson, and she never discussed the conversation she had with the investigator with Davis or anyone else at the DuBois Center. (Mayers Decl. ¶¶ 6-8.)

On February 14, 2012 Plaintiff was assigned a route comprised primarily of stops in the rural outskirts of Punxsutawney. (CSUMF ¶18.) While attempting a delivery on a steeply graded private road known as "Big W Drive," Plaintiff encountered an oncoming U.S. Postal Service vehicle which began sliding down the roadway toward Plaintiff's package car. (*Id.*

---

[5] According to the DOL's Rules and Regulations:

> [29 C.F.R.] Section 825.110 sets forth the eligibility standards an employee must meet in order to take FMLA leave. To be eligible, an employee must have been employed by the employer for at least 12 months, must have been employed for at least 1,250 hours of service in the 12-month period immediately preceding the commencement of the leave, and must be employed at a worksite where 50 or more employees are employed by the employer within 75 miles.

78 FR 8834-01 (Feb. 6, 2013). *See also* 29 C.F.R. §825.110(a)(1).

¶¶19-20; Pl.'s Dep. 99-100, ECF No. 31-2.)  As Plaintiff applied the brakes to her vehicle, she

began sliding backward down the hill and got stuck in a ditch.  (Pl.'s Dep. 101, ECF. No. 31-2;

*id.* at 102-03, ECF No. 31-3.)  Unable to extricate the vehicle by herself, Plaintiff accepted help

from two nearby residents who pulled the package car out with a backhoe.  (Pl.'s Dep. at 103-08,

ECF No. 31-3; CSUMF ¶¶22-23.)   Plaintiff and the two individuals who assisted her then

inspected the vehicle for damage but found none.  (Pl.'s Dep. 118-19, 125, Pl.'s Ex. A, ECF No.

34-1; Pl.'s Ex. B, ECF No. 34-1.)

       In all, the incident lasted approximately 45 minutes, 30 of which Plaintiff accounted for

in the Company's time-card system as unpaid lunch time.  (Pl.'s Dep. at 108-110, ECF No. 31-3;

CSUMF ¶24.)   Because she was behind schedule on her route, Plaintiff texted a fellow-driver

with a request for help on a scheduled pick-up, noting that she'd "[h]ad a BAD morning [and]

got stuck for 45 mins..."  (Pl.'s Ex. C, ECF No. 34-1.)   She did not contact any member of

management at the DuBois Center.

       Plaintiff eventually returned to the DuBois Center at approximately 9:00 p.m. that night.

(Pl.'s Dep. 113, 116, ECF No. 31-3.)  Upon completing her post-trip inspection of the package

car, she noticed damage to the passenger side of the vehicle.  According to Plaintiff, this damage

was only "slight" and consisted of "a one-or-two inch [piece] of angle iron [that had been]

moved over about a half inch to an inch."  (Pl.'s Dep. 118, ECF No. 31-3.)  Plaintiff concedes

this damage was incurred at some point during the course of her route on February 14, 2012, but

she does not believe that it happened at the time she got stuck on Big W Drive, because neither

she nor the two individuals who had helped extricate her vehicle had noticed any damage to the

package car afterward.  (*Id.* at 118-19, ECF No. 31-3; Pl.'s Ex. B, ECV No. 34-1.)

In any event, upon noticing the damage, Plaintiff summoned the on-duty mechanic, David Yoder, and pointed it out to him. (Pl.'s Dep. 124-25, 129, ECF No. 31-3.) What occurred during this exchange is disputed by the parties.

Yoder's account is memorialized in a February 23, 2012 email to the Company's Mid-Atlantic Automotive Supervisor, Pat Rossi, who was Yoder's boss. The email states the following:

> On February 14, 2012 around 9:20 pm I was on the phone with Eric Starner, the Kane mechanic when Penny Anderson came to me waiving a [Driver Vehicle Inspection Report] slip and saying she needed to talk to me. I told Eric I would call him back. When I got off of the phone Penny told me she slid off the road and got stuck in a ditch trying to avoid an accident with a mail truck that was sliding towards her. She then said rather than have the company charged for a tow she had an excavator pull her out. As we proceeded to walk towards the vehicle she told me she hit a tree and had damage to the side of the truck. Penny said she did not record the accident or damage on the DIVR [sic] slip because she didn't want to get into trouble. (She told me that all I needed to do was take a hammer and knock it back into place.) When we got to the truck, she pointed out the damage to the pillar support on the side of the vehicle again saying, you just need to take a hammer and knock it back into place. Penny then left. I proceeded to look at the vehicle from ground level and grabbed where the damage was to determine what needed to be done and the whole support shook. I then determined it needed more than just knocking it into place with a hammer. I turned around, Scott and Charlene Snyder and Dario Wayne were observing the damage from the belt catwalk. I said to them this is going to take more than two minutes and a hammer, this is structural support damage. Then, Charlene brought out Josh Crabb, the Local Sort supervisor to look at it. Josh then took pictures with the a [sic] digital camera while I went back and was working in my bay area. I then moved the vehicle to my bay and the first thing I did was take pictures from ground and ladder level. I called my boss, Pat Rossi, and told him the situation and he said to call Melissa Davis. I did and had to leave a message so I called Pat Rossi again and he advised me to do the repair. I did the repair and put it back on the line for the next morning.

(Def.'s Ex. F at p. 15, ECF No. 31-12.)

Plaintiff provides a different version of the events, as set forth in her deposition testimony. Plaintiff acknowledges showing Yoder the deviation in the angle iron and telling him

that she had slid down a hill into a ditch and had to get pulled out; however, she denies any suggestion that the damage was related to that incident on Big W Drive. (Pl.'s Dep. 125, ECF No. 31-3.) Plaintiff further denies saying anything about colliding with a tree or telling Yoder that she was not going to report the damage because she did not want to get into trouble. (*Id.* at 129-30, ECF No. 31-3.) Rather, Plaintiff claims that she asked Yoder whether she should report the damage on the DVIR and was told by him not to do so. (Pl.'s Dep. 119, 121, 125, 130, ECF No. 31-3; *id.* at 126, Pl.'s Ex. A, ECF No. 34-1.) She states that Yoder had told her in the past "if there were … anything wrong [with] the vehicle, to come see him first, because people were nitpicking and he had to do a lot of paperwork." (*Id.* at 127.) Plaintiff maintains that, based on Yoder's advice, she did not disclose the damage on the DVIR and instead indicated that the condition of the vehicle was "satisfactory." (*Id.* at 121, 125-26.)

At some point prior to leaving the DuBois Center for the night, Plaintiff had a conversation with Crabb, the on-duty supervisor, concerning the Company's "Telematics" system, which is a set of technologies designed to monitor the performance of its package cars. (Pl.'s Dep. 53, ECF. No. 31-2; *id.* at 122, ECF No. 31-3; CSUMF ¶25.) Plaintiff claims that she asked about the system only because she had missed the morning meeting where it had been discussed. Plaintiff testified to this exchange as follows:

> … there was a paper lying on the counter where we do our checkout work, and seeing that I'm not in every morning meeting, I said, what is that? And he picked it up and he said, this is – they discussed this in the morning meeting. I said, well, I'm not always at the morning meetings. I don't drive every day. And that's when he said – and those were his words – that's the tattletale system.

(Pl.'s Dep. 54, ECF No. 31-2.) According to Plaintiff, Crabb advised her that the technology had not yet been installed on her vehicle. (*Id.* at 123, ECF No. 31-3.) It is undisputed that Plaintiff never disclosed the damage to her package car to Crabb prior to leaving work on February 14,

2012.  (Pl.'s Dep. 124, ECF No. 31-3.)  In addition, Plaintiff did not contact Davis or anyone else from management that evening.  (*Id.* at 132.)

After Plaintiff had left the Center, Crabb was summoned to inspect the damage to the package car.  He took photographs and emailed them to Davis, who was not at the DuBois Center at the time.  (CSUMF ¶36.)  The pictures showed that the package car's pillar support was not fastened to the side of the vehicle and was pushed forward.  In addition, the photos showed tree bark protruding from the top of the package car.  While Plaintiff acknowledges that the photos show tree bark, she claims the pictures are misleading in that they show the state of the pillar support after Yoder had grabbed the piece of metal and pulled it by hand from the side of the truck.  (CSUMF ¶36.)

The following morning, Crabb had a telephone conversation with Davis about the photographs and the comments Plaintiff had allegedly made to Yoder.  Crabb also informed Davis that Plaintiff had not reported the accident to him.  At Davis' direction, Crabb prepared a written statement concerning the events of the prior evening.  (CSUMF ¶ 39.)  This statement provides as follows:

> On Tuesday 2/14/12 I was informed by the mechanic Dave Yoder that package car 670176 was damaged.  The time was around 2125.  I took two pictures of the truck and sent them to Melissa Davis.  Dave Yoder told me that Penny Anderson asked him not to tell anyone and to pound out the damage.  Penny Anderson left the building and did not report the accident to me.  I followed up with Melissa Davis at 550 on the morning of Wednesday 2/15/12.

(Def.'s Ex. F, Pt. 3, p. 2, ECF No. 31-12.)

Later in the morning of February 15, Davis contacted her boss, Chad Quivers, to report the accident.  (CSUMF ¶40.)  Quivers then instructed Davis to conduct an investigation.  (*Id.*)  Davis reviewed the Telematics report from Plaintiff's package car which was, in fact,

operational, allowing her to identify the precise time of the incident and the location on Big W Drive where it had occurred.  (CSUMF ¶41.)  Davis also reviewed the photographs of the package car and observed that the pillar support had been pulled away from the side of the vehicle.  (*Id.*)  She physically inspected the package car and noticed that there was tree bark stuck in the top portion of the vehicle and that the passenger door was hard to open and close.  (*Id.*)  She spoke to Yoder and obtained a write-up from him as well as from Crabb concerning their involvement.  Finally, Davis travelled to the scene of the incident and observed tire tracks off to the side of the road and as well as a v-shaped piece of bark missing from the adjacent tree.  (*Id.* at ¶¶ 41-42.)  According to Davis, the area of missing bark lined up roughly to the point of the package car where tree bark was found.  (*Id.* ¶42.)  It is undisputed that, during the course of her investigation, Davis did not speak to Plaintiff or either of the individuals who had helped extricate her vehicle.  (*Id.*)

Meanwhile, Plaintiff had texted Ho on the morning of February 15 to inform him that she was taking Flexeril for her back spasms and would need to take an unscheduled FMLA day.  (Pl.'s Dep. 133, ECF No. 31-3.)  She did not inform him at that time of the damage she had sustained to her package car.  (CSUMF ¶43.)  At around 9:00 p.m. that night, Plaintiff awoke to find a message on her phone from her sister-in-law, Jennifer Moore, who was a fellow package car driver at the DuBois Center.  (Pl.'s Dep. at 134-35, ECF No. 31-3.)  In her message, Moore advised Plaintiff to call Davis because there was a rumor at work that Plaintiff had slammed into a tree the day before.  (*Id.* at 134-36.)

Shortly thereafter, Plaintiff left a voice mail message for Davis, followed by a text message.  (*Id.* at 136.)  The voice mail message was as follows:

Hey Melissa this is Penny. We're getting ready to go down to Pittsburgh [for a prescheduled doctor's appointment]. Doc wanted me to come down early in the morning, but someone called me from work and told me I didn't supposedly report an accident yesterday. Yesterday when I was going up a hill, mail lady was coming down hill, on a one lane road, she was sliding towards me. I stopped the truck and she just kept coming toward me and I went into the ditch. I didn't realize there was any damage to the truck until I got back to [the] center. I talked to Dave Yoder and told him. He said don't sweat it, don't worry about it. I didn't think any [sic] nothing was broken on [the] truck and when I went around did post truck [sic] I told Dave. So that's what's going on. Someone called me from the center and told me they were taking pictures and everything else and I was going to get fired. I didn't hit a tree. I went into a ditch. There was a man behind me who took me up the road to the neighbors who got an excavator and pulled me out. If there is any problems [sic] you can talk to either of them. I didn't hit anything. I stopped. I'll talk to you in the morning. Thanks, bye.

Pl.'s Dep. at 138-39, ECF No. 31-3.) Plaintiff's follow-up text read:

I left you a voice mail. I'll call you in the morning. If I had seen any damage to the truck before I got back to the center I would have called immediately. And during post trip I noticed it and immediately told mechanic and he said ok, don't sweat it … I'll see what I can do. I also told Scott McB the same thing when I talked to him about getting my air.

(*Id.* at 139.)

On February 16, 2012, Plaintiff took a pre-scheduled FMLA day to drive to a doctor's appointment in Pittsburgh. (Pl.'s Dep.140, ECF No. 31-3.) Later that night, Davis texted Plaintiff and advised her to come to the center at 8:30 a.m. the next morning. (*Id.* at 141.)

When Plaintiff arrived at the DuBois Center on the morning of February 17, 2012, she was directed to a meeting with Davis, Ho, and John Hathorn, a fellow package car driver and shop steward for the Union. (Pl.'s Dep. 141, ECF No. 31-3; Hathorn Dep. 9-13, ECF No. 31-5.) After hearing Plaintiff's version of the events of February 14, 2012, Davis indicated that she was terminating Plaintiff's employment for dishonesty because of the fact that Plaintiff had not reported the accident. (Pl.'s Dep. 141, ECF No. 31-3.) According to Plaintiff, Davis indicated that she did not agree with the termination decision but was merely doing what her "upper" told

her to do. (Pl.'s Dep. 141-42, ECF No. 34-1.) Plaintiff claims she told Davis that there was no truth to the rumor that she had hit a tree, but Davis indicated that she was going by what Yoder had told her and what she saw in the pictures taken by Crabb. (*Id*. at 142-43.) Plaintiff also claims that Davis told her to "please grieve this." (*Id*. at 144.) Davis formalized the termination in a letter dated February 20, 2012, which cited Plaintiff's failure to report the February 14, 2012 accident to a member of the management team as an incident that "constitutes dishonesty." (ECF No. 31-4 at 22.)

Plaintiff grieved her termination, and the matter eventually proceeded to an arbitration hearing. On September 7, 2012, the arbitrator entered an award for UPS. (Def.'s Ex. A, Pt. 4 at pp. 15-33, ECF No. 31-4.) In relevant part, the arbitrator concluded that Plaintiff "knew she had had an accident within the meaning of Article 18, Section 3 [of the Labor Agreement] and the Company Policy and that she intentionally decided not to report it, thereby committing the cardinal infraction of dishonesty." (*Id.* at p. 27.) Based on these conclusions, the arbitrator found that UPS had just cause to discharge Plaintiff, and he denied her grievance. (*Id.* at 27-28.)

Plaintiff commenced administrative proceedings with the Pennsylvania Human Relations Commission and the EEOC, and her administrative complaints were dismissed on January 7 and June 24, 2013, respectively. (Def.'s Ex. F, Pt. 3 at pp. 6-8, ECF No. 31-12.) Plaintiff appears to have properly exhausted her administrative remedies, and Defendant does not contend otherwise.

On July 1, 2013, Plaintiff filed this lawsuit. In her complaint, Plaintiff asserts three causes of action. Count I asserts claims under the FMLA based on the theory that Plaintiff was discharged because UPS did not want to deal with the complications created by her intermittent use of medical leave time and/or because UPS sought to retaliate against Plaintiff for her complaint to the Department of Labor. Counts II and III assert claims of gender discrimination

13

under Title VII and the PHRA, respectively, based on the theory that UPS treated a similarly situated male employee who failed to report an accident more favorably than Plaintiff was treated.

On August 1, 2014, Defendant filed its pending motion for summary judgment (ECF No. 28) and supporting materials (ECF Nos. 29, 30, 31). Plaintiff filed her memorandum and related materials in opposition to Defendant's motion (ECF Nos. 34 and 35) on September 16, 2014. Thereafter, Defendant filed its reply brief (ECF No. 38) on October 6, 2014. The issues raised by Defendant's motion have thus been fully briefed and are now ripe for disposition.

## IV. Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *American Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994)).

14

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials of the … pleading," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n. 11 (1986)) (ellipsis in the original). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993).

## V. Discussion

### A. <u>Plaintiff's FMLA Retaliation Claim</u>

Count I of the complaint is styled as an FMLA retaliation claim. Plaintiff's theory is that her termination for "dishonesty" was pretextual and that the real reason for her dismissal was her use of leave under the FMLA.[6] (Pl.'s Br. Opp. Mot. Summ. J. 4, 10, ECF No. 35.) Although she does not identify the individual whom she believes to be the ultimate decisionmaker, Plaintiff appears to be arguing that Davis fired her at the direction of upper management and pursuant to a corporate culture that was intolerant of employees who used leave under the Company's FMLA policy.

---

[6] The FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter" and "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. §2615(a)(1) and (2).

FMLA retaliation claims based on circumstantial evidence are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Szostek v. Drexel Univ.,* --- F. App'x ---, Case No. 14-1107, 2015 WL 78774, at *2 (3d Cir. Jan. 7, 2015); *see Lichtenstein v. Univ. of Pittsburgh Med. Ctr. ("Lichtenstein I")*, 691 F.3d 294, 302 (3d Cir.2012) (noting that, "[b]ecause FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law"; accordingly, claims based on circumstantial evidence are assessed under the *McDonnell Douglas* framework).

To establish a *prima facie* case of retaliation, an employee "'must point to evidence in the record sufficient to create a genuine factual dispute about ... (a) invocation of an FMLA right, (b) termination, and (c) causation.'" *McElroy v. Sands Casino,* --- F. App'x ---, Case No. 14-1325, 2014 WL 6601030, at *2 (3d Cir. Nov. 21, 2014 (*quoting Lichtenstein I,* 691 F.3d at 302) (ellipsis in the original)). If the employee satisfies her *prima facie* burden, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* (citing *Lichtenstein, I, supra,* at 302). Once the employer does so, the employee "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994). *See Szostek v. Drexel Univ.,* 2015 WL 78774, at *2 and n.1 (applying *Fuentes'* analysis to an FMLA retaliation claim); *Lichtenstein I,* 691 F.3d at 302 (same).

To survive summary judgment at the pretext stage, the plaintiff must submit evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a

factfinder could reasonably conclude that each reason was a fabrication." *Szostek,* 2015 WL 78774, at *2 (internal quotation marks and citation omitted). The plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is ... not whether the employer is wise, shrewd, prudent, or competent." *Id.* (*quoting Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997)) (internal quotations omitted). Instead, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (*quoting Keller*, 130 F.3d at 1108–1109) (internal quotations omitted).

In this case, UPS has neither conceded nor challenged Plaintiff's ability to establish a *prima facie* case of discrimination. Instead, UPS contends that Plaintiff cannot demonstrate that its proffered explanation for her termination was a pretext for unlawful retaliation. This Court agrees that no reasonable jury could return a verdict for Plaintiff on the ultimate issue of pretext.

Here, the record shows that UPS had ample grounds to conclude that Plaintiff had committed a terminable offense by failing to report an "accident" as defined by company policy. Plaintiff acknowledges that she knew of her mandatory duty to promptly report all accidents to management level personnel and that a failure to do so constituted grounds for discharge. (CSUMF ¶15.) Plaintiff further admits, and the record is clear, that UPS defines an "accident" as involving any property damage to one of its vehicles, "no matter how slight." (*Id.*) UPS has produced uncontroverted evidence that, at the time the adverse decision was made, Davis possessed the following information: (i) Plaintiff's vehicle had been immobilized for 45 minutes and was extricated with the use of a back-hoe; (ii) photographs of the vehicle showed physical damage to the passenger side; (iii) tire tracks and missing tree bark had been observed at the

scene of the incident; (iv) tree bark was found on the package car; (v) the vehicle's passenger side door could not be opened or closed without difficulty; (vi) Yoder had provided statements indicating that Plaintiff had admitted hitting a tree, did not want to get in trouble, and wanted Yoder to fix the damage with a hammer; (vii) Plaintiff had not reported the damage to Crabb on the evening of February 14, 2012, and had not reported the damage to Davis prior to her February 15, 2012 voicemail message and text, after management had already learned of the accident; and (viii) Plaintiff had denied hitting a tree or any other object in her communications to Davis. Under the circumstances, UPS had objectively reasonable and nondiscriminatory grounds to terminate Plaintiff pursuant to its official corporate policy.

Plaintiff's attempts to cast doubt on UPS's stated reason for her termination are unavailing based on the record before the Court. In an effort to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in UPS's explanation, Plaintiff claims there was an accepted practice at the DuBois Center whereby drivers would defer to the mechanic in terms of whether or not to report minor damage to their vehicles. Plaintiff testified that, on numerous occasions, she and other drivers incurred broken mirrors or other minor damage to their vehicles, which Yoder would fix without the employees writing up the damage or reporting it to management. (CSUMF ¶¶ 26, 28.) She claims that, on these occasions, no one was ever terminated for their failure to write up or report the damage. In addition, Hathorn stated that he exercises discretion in terms of whether or not to report damage and, although he would report a significant scratch, he would not report a minor one. (CSUMF ¶26.)

Assuming this evidence is credited, it fails to cast any meaningful doubt on UPS's stated reason for firing Plaintiff. To begin, no inference of pretext logically arises from the alleged practice of drivers at the DuBois Center not reporting minor damage unless Plaintiff can

demonstrate that the relevant decisionmakers in her case were aware of, and condoned, this practice. Here, the evidence fails to establish that Davis or any of her superiors were aware of the alleged practice at the time of Plaintiff's termination.[7] There is no dispute that Yoder is not a management level employee of UPS and had no power to override official corporate policy, so the fact that he may have encouraged this practice is of no evidentiary moment.

In addition, Plaintiff needs to show that the decisionmakers, acting pursuant to this unofficial policy, treated employees who were not taking FMLA leave more favorably than Plaintiff was treated. *See, e.g., Epps v. First Energy Nuclear Oper. Co.,* No. 11-1462, 2013 WL 1216858, at *24 (W.D. Pa. Mar. 25, 2013) (noting that, at the pretext stage, the plaintiff "must come forward with specific evidence showing that [similarly situated] comparators were treated more favorably in order to permit the inference that the discipline imposed in her case was discriminatory"). Here, Plaintiff has offered evidence of an incident in which Hathorn got a scratch on his truck and Yoder spray painted the scratch without the damage being recorded on a DVIR form. (CSUMF ¶26.) However, Hathorn testified that, on this occasion, he telephoned the center immediately after incurring the scratch and informed management of the incident. (Hathorn Dep. 53, Pl.'s Ex. D, ECF No. 34-1.) In addition, it is undisputed that Crabb was present when the repair was performed and photographed the damage pursuant to UPS policy;

---

[7] Davis testified that she was not aware of mechanics routinely taking care of "petty things that are handled inside and never turned into an accident." (Davis Dep. 139, Pl.'s Ex. F, ECF No. 34-1.) In her response to Defendant's Concise Statement of Undisputed Material Facts, Plaintiff cites testimony by Davis which supposedly shows that no changes were made by UPS to terminate the practice after Davis learned about it through Mr. Hathorn's testimony at the arbitration proceeding,. (CSUMF ¶26.) The Court is unable to locate the cited testimony in the evidentiary record, but, in any event, the alleged testimony is equivocal. According to the portion of the testimony recited by Plaintiff, Davis merely stated that UPS policy and procedure are discussed with employees on a daily basis, but no special meeting held, nor was a special memorandum sent to employees, to address the practice that Hathorn testified about at the arbitration proceeding. (CSUMF ¶ 26, ECF No. 34.) This does not necessarily support the conclusion that Davis ever condoned or tolerated the informal practice of not writing up minor damage to UPS vehicles. Moreover, it is clear from the context of the discussion that any knowledge Davis had concerning this alleged practice was gained after the employment decision in question was made.

thus it is clear that Hathorn fulfilled his responsibility of notifying UPS management of the damage to his vehicle. (*Id.*) Although Plaintiff cites this episode as an example where damage was not officially written up as an "accident," Article 18, Section 3 of the Labor Agreement establishes that a driver's duty to "complete a report of the accident" is distinct from the driver's duty to immediately notify management. (*See* CSUMF ¶5; *see also* Davis Dep. 112:25-113:9, Pl.'s Ex. F, ECF No. 34-1 (indicating that, even if Plaintiff had recorded the damage on a DVIR form, she still needed to notify management, and reporting the accident would have resulted in minor discipline)). Here, Plaintiff was terminated not simply because she failed to complete a DVIR form, but because she failed to report her accident to management by any of the various means that were available to her. (See CSUMF ¶ 6.) Moreover, notwithstanding Hathorn's testimony that he uses his discretion in determining whether to report minor damage, Hathorn agreed that Plaintiff should have reported the February 14, 2012 incident to management and should have recorded the damage on the DVIR slip. (CSUMF ¶55.) These facts make Plaintiff's February 14, 2012 accident materially dissimilar from the incident involving Hathorn, and therefore, no meaningful inference of discriminatory animus can be drawn from the fact that Hathorn was not disciplined for his failure to record the scratch on a DVIR form.

Plaintiff's only other comparator evidence concerns an incident involving Dan Heitsenrether, a long-service, full-time Package Car Driver. The record shows that, in October 2009, Heitsenrether was involved in an accident in which he ran into and broke a steel cable running between two pillars at the entrance of the property where he was making a delivery. (CSUMF ¶¶ 66-67.) Heitsenrether did not immediately report the incident to UPS management. (*Id.* ¶68.) After the property owner called the DuBois Center to report the damage, Heitsenrether was contacted by David Waters, then the DuBois Center Manager. Heitsenrether initially denied

that there was a cable running across the entrance to the property (*id.*); however, after getting off the phone with Waters, he called Waters back and reported that there was observable damage to his package car consistent with hitting a cable. (*Id.* ¶69.) Later that evening when Heitsenrether returned to the DuBois Center, he and Waters inspected the vehicle and Heitsenrether again admitted that he must have hit the cable. (*Id.* ¶70.) In accordance with UPS policy, Heitsenrether was discharged by letter the next day for failing to immediately report the accident. (*Id.* ¶73.) Heitsenrether grieved his termination and testified at a hearing that he was unaware that he had hit the cable and otherwise would have immediately reported the incident. (*Id.* ¶ 74.) Ultimately, UPS negotiated a settlement agreement with the Union, pursuant to which Heitsenrether was reinstated to his job, subject to a "Last Chance Agreement" and "Final Warning." (*Id.* ¶75.) UPS contends that it negotiated the settlement because management believed Heitsenrether was sincere, and because he had been a longtime employee with a good work record. (*Id.* ¶ 74.) Plaintiff contends that UPS treated Heitsenrether more favorably in part because he did not utilize FMLA leave. (*Id.* ¶¶74-75.) Regardless of this disagreement, the Court finds that Heitsenrether is not a valid comparator for purposes of Plaintiff's FMLA claim.

The Third Circuit Court of Appeals "has not explicitly stated what constitutes a similarly situated employee," but it "accept[s] the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster General,* 441 F. App'x 879, 881-82 (3d Cir. 2011) (citing *Russell v. University of Toledo*, 537 F.3d 596 (6th Cir. 2008); *Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 259–261 (5th Cir.2009)). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decisionmakers, and the nature of the misconduct engaged in." *Wilcher,* 441 F. App'x at 882

(*citing Lee*, 574 F.3d at 259–261; *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744 (7th Cir.2006)). Here, it is undisputed that, at the time of Heitsenrether's grievance proceedings, Waters was the manager of the DuBois Center and the apparent decisionmaker. Plaintiff has not produced any evidence to suggest a commonality of decisionmakers as between Heitsenrether's case and Plaintiff's. Because Heitsenrether is not "similarly situated" to Plaintiff, UPS's employment decision in his case does not support an inference of unlawful discriminatory motive with respect to Plaintiff's termination.

Plaintiff also attempts to show pretext by pointing to various aspects of the decision-making process that she believes are illogical or inconsistent and, therefore, indicative of UPS's insincerity. (*See generally* CSUMF ¶77, ECF No. 34.) None of these proffers materially supports her theory that the stated reason for her discharge was a fabrication.

For example, Plaintiff cites the fact that Yoder was required to provide a written statement and, subsequently, a more detailed supplemental statement concerning his interaction with Plaintiff on February 14, 2012, whereas he had never before been required to do so in "similar circumstances." (CSUMF ¶77(a), ECF No. 34.) Plaintiff cites no evidence to support her conclusory reference to other cases supposedly involving "similar circumstances,"[8] nor does she even identify who among UPS's managers required the statements to be written down. Assuming she is referring to Davis, there is no basis to infer a discriminatory motive on her part merely because she undertook efforts to obtain written statements from a material witness who had knowledge about a potentially terminable offense; rather, such action is perfectly consistent with a good faith intent to conduct a reasonable and accurate investigation.

---

[8] Based on Yoder's testimony, it appears that Plaintiff may be referring to the incident involving Dan Heitsenrether. For the reasons previously discussed, however, Heitsenrether is not a viable comparator for purposes of Plaintiff's employment discrimination claims.

Plaintiff also asserts that Yoder's statement was false insofar as it suggested that she was trying to keep her accident a secret and/or insofar as it failed to disclose the fact that Yoder told Plaintiff she did not have to report the accident. In similar fashion, Plaintiff criticizes Yoder's repair to the vehicle as overly extensive and unnecessary. She alleges that the damage to her vehicle consisted only of a bent piece of iron, which Yoder made worse by pulling on it during his inspection. Assuming the record supports a genuine dispute about these facts, the dispute does not concern a material issue. At most, Plaintiff's proffer shows that Yoder failed to accurately relate certain facts to members of UPS's management, thereby compromising the Company's business judgment. However, in a pretext case, the ultimate issue is the employer's intent, not whether the employer exercised good business judgment. *See Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 261 (3d Cir.2013) (To cast doubt on an employer's proffered reasons for an adverse employment action, it is not enough to show that the employer's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.") (*citing to Fuentes v. Perskie*, 32 F.3d at 765). To demonstrate a triable issue of pretext, Plaintiff must produce evidence that supports a reasonable inference that Davis or other UPS decisionmakers did not, in fact, rely in good faith on the information provided by Yoder. *See Fuentes,* 32 F.3d at 766-67 (stating that "the issue is not whether the staff members' criticisms of [plaintiff] were substantiated or valid, or whether [the decisionmaker] was remiss to rely on feedback received from members of plaintiff's staff who might be (nondiscriminatorily) biased against him"; rather, the question "is whether [the decisionmaker] believed those criticisms to be accurate and actually relied on them…"). Plaintiff has failed to adduce any evidence along these lines.

Plaintiff also cites Crabb's involvement in photographing the damage to the package car and forwarding the photos to Davis after Yoder had supposedly made the damage look worse than it originally was. However, no logical inference of insincerity on the part of UPS can be drawn from Crabb's actions. The record establishes that Crabb was made aware of the damage to Plaintiff's package car only after Plaintiff had left the Center and two employees of a carwash service utilized by UPS reported the damage out of concern that they might otherwise be held liable for it. (CSUMF ¶35.) Crabb's only involvement from that point on was as follows: (i) he photographed the damage, pursuant to UPS policy; (ii) he sent the photos to Davis; (iii) he informed her (truthfully) that Plaintiff had not reported the accident to him; and (iv) he subsequently provided a written statement concerning his knowledge of the event, which was based partly on information gathered from Yoder. To the extent that Crabb's photographs inaccurately depicted the state of the package car as it existed when Plaintiff originally returned to the DuBois Center, the inaccuracy is due solely to the fact that Crabb took his pictures only after Yoder had already inspected the vehicle and allegedly made the damage appear worse. However, Plaintiff has not produced any evidence suggesting that Crabb knew of Yoder's actions or was otherwise aware that his photographs did not accurately depict the state of the vehicle. In light of the record at hand, any suggestion that Crabb intentionally doctored the evidence and/or acted pursuant to a corporate directive so as to influence Plaintiff's termination based on her use of FMLA time is entirely speculative.

Plaintiff faults Davis for allegedly failing to recognize that it would be illogical for Plaintiff to intentionally try to hide minor damage to her vehicle when there would have been no serious repercussions from reporting it. In addition, Plaintiff objects that Davis conducted a "one-sided investigation" that did not include interviewing Plaintiff or her two independent

witnesses. Although Plaintiff claims that she and her two independent witnesses would have stated that there was no observable damage to the package car after it was extricated with the backhoe, this additional evidence is beside the point because Plaintiff acknowledges that she knew she incurred damage to her vehicle at some point during the course of her deliveries on February 14, 2012 but did not report the damage to management at any time prior to leaving the Center that night. These undisputed facts provided valid grounds for Plaintiff's termination, and Plaintiff cannot show that the stated reason was a fabrication simply by arguing that Davis should have conducted a more thorough investigation. *See Geddis v. Univ. of Delaware,* 40 F. App'x 650, 653 (3d Cir. 2002) (Title VII plaintiff could not survive summary judgment by arguing that the allegations against him are false and/or that his employer failed to adequately investigation the allegations; "it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus.")

As evidence that she was unlawfully targeted for termination, Plaintiff points to Davis's alleged statement at the termination meeting that she did not agree with the employment decision but was acting in accordance with a directive from her "upper." Davis disputes the statement attributed to her and claims to have been the decisionmaker in this case but, in any event, it is difficult to see how the cited evidence supports Plaintiff's pretext claim. Plaintiff does not identify the alleged "upper management" decisionmaker but, assuming it was Davis' boss, Chad Quivers, Plaintiff has not adduced any evidence to suggest that Quivers was even aware of (much less hostile to) Plaintiff's use of leave under the Company's FMLA policy. Absent some evidence to link the relevant decisionmaker with an anti-FMLA bias, no rational jury can draw the inference that Plaintiff was terminated because of her FMLA-related leave.

Plaintiff's other evidentiary proffers are similarly insufficient to support a reasonable finding of pretext. She contends that her stop counts were increased in June of 2011, after she was approved for intermittent FMLA leave, and even more so in August 2011, after her heated argument with Ho about her right to take leave under the Company's FMLA policy. She maintains that Ho, the dispatch supervisor, was responsible for the increase in her stops. (CSUMF ¶82.) However, the record establishes that Ho was not working at the DuBois Center during this timeframe and had no responsibility for the dispatch services there. (*Id.* ¶83.) Moreover, there is no evidence to support Plaintiff's contention that she experienced an increase in her stop counts. (*Id* ¶85.) Finally, Ho provided unrebutted testimony that, even when he was responsible for dispatching driving routes, he did not have usually have advanced knowledge as to which driver would ultimately be handling the route. (*Id.* ¶84.) Ho testified that the dispatches are handled in accordance with UPS corporate guidelines, which constrains deviation. (*Id.*)

Plaintiff also contends that her alleged argument with Ho about FMLA rights and the ensuing complaint that she filed with the Department of Labor are supportive of her discrimination claim. As noted, however, the record is undisputed that Ho was not working at the DuBois Center in August 2011, when Plaintiff allegedly had the argument with him that led to her filing an administrative complaint. (CSUMF ¶88.) Moreover, there is no evidence in this record to establish that the relevant decisionmakers were aware of Plaintiff's filing of the DOL complaint. Plaintiff admits that she never informed any member of management about the complaint. (*Id.* ¶90.) Furthermore, it is undisputed that an investigator from the DOL contacted Linda Mayers, a human resources employee who worked in a separate UPS facility. Mayers has presented unrebutted evidence that no documentation was ever received from the DOL, and she

did not discuss the incident with Davis or anyone else at the DuBois Center. It is undisputed that no violations were charged against UPS, and Davis and Ho both deny having had any knowledge of Plaintiff's complaint to the DOL. (Mayers Decl. ¶8, ECF No. 31-14; CSUMF ¶¶90-91.) Moreover, the administrative records supplied by Plaintiff indicate that no charge was filed against UPS by the DOL, as it appeared that Plaintiff was not eligible to take FMLA leave for the day that she was denied. (Pl.'s Ex. G, ECF No. 34-1.) Under the circumstances, there is no support in the record for Plaintiff's assertion that the relevant decisionmakers must have known of her complaint to the DOL and retaliated against her because of it.

To support her theory that she was targeted for dismissal, Plaintiff points to a comment that Crabb allegedly made to the effect that Davis was being sent to the DuBois Center to "clean up the FMLA people." (Pl.'s Dep. 170, ECF No. 34-1.) Plaintiff admits, however, that the comment was made in reference to two other employees who were actually abusing FMLA leave. (*Id.* at 170-72.) There is no evidence that these employees were disciplined or terminated because of their leave practices; on the contrary, the record shows that one of the allegedly abusive employees was promoted to a managerial position in March of 2012, shortly after Plaintiff's termination. (*Id.* at 174.) Furthermore, any suggestion that Davis harbored a discriminatory intent toward Plaintiff is contradicted by Plaintiff's theory that Davis did not want to fire her and did so only at the direction of her superior. In light of these considerations, Crabb's alleged comment must be regarded as a stray remark unconnected to the decision-making process which is not probative of discriminatory intent relative to Plaintiff's termination.

Plaintiff also points to the timing of her discharge, which occurred immediately after her use of two FMLA days. On February 15 and 16, 2012, Plaintiff took an unscheduled FMLA day and a pre-scheduled FMLA day, respectively. The following morning, she was called into a

meeting at work and notified of her termination. Plaintiff appears to be arguing that the proximity of her notice of discharge and her use of FMLA days is suggestive of a retaliatory intent on the part of UPS. Of course, this argument overlooks the fact that the February 14 accident occurred just one day prior to Plaintiff's use of her leave days, and Plaintiff's failure to report that accident constituted grounds for her termination. As the Court has previously observed, UPS had ample evidence to support the conclusion that Plaintiff had committed a terminable offense by knowingly failing to report an accident, and Plaintiff has failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Szostek*, 2015 WL 78774, at *2 (internal quotation marks and citation omitted). Viewed in context, Plaintiff's use of leave in the days immediately preceding her termination fails to rationally support an inference that it was her use of those days, as opposed to her contemporaneous misconduct, that motivated the adverse employment decision. *See Lopez v. Lopez,* 997 F. Supp. 2d 256, 271 (D.N.J. 2014) ("Taking an FMLA leave of absence does not, of course, shield a plaintiff from discipline for misconduct.") (citing cases); *Crewl v. Port Auth. of Allegheny County,* 837 F. Supp. 2d 495, 504 (W.D. Pa. 2011) ("The FMLA does not shield an employee from termination if the employee was allegedly involved in misconduct related to the invocation of the FMLA leave.").

In general, Plaintiff's theory is that management personnel at the DuBois Center rely on good attendance for smooth operations and that absenteeism causes problems, such as requiring managers to drive routes rather than performing their regular managerial duties. To that end, she has produced evidence suggesting that management personnel get frustrated when too many people call off or there are not enough drivers, and managers will sometimes pressure employees

to come into work rather than allow them to take sick days. (CSUMF ¶81.) On a more personal level, she has produced evidence suggesting that Crabb sometimes complained about her not coming in to do the "local sort." (*Id.*)

However, the fact that the Company may have had a motive to terminate her for her use of medical leave does not support the conclusion that it acted with such an intent, absent more probative evidence than is present here. In this case, the evidence fails to support a reasonable inference that any person connected to the decisionmaking process acted with an FMLA-related animus. Although Plaintiff asserts that Davis acted at the direction of her superior -- presumably, Quivers, Plaintiff has not proffered any evidence that would rationally support a finding of unlawful animus on his part. Insofar as Davis is concerned, there is no evidence to suggest that Davis ever retaliated against Plaintiff or other employees who took FMLA leave; on the contrary, Plaintiff acknowledges that one of the female employees who was widely regarded as having abused the FMLA policy was actually promoted to a management level position under Davis's tenure. Moreover, the record on balance shows that Plaintiff's use of leave time was generally accommodated by her superiors. UPS approved both of Plaintiff's applications for intermittent leave under the Company's FMLA Policy with respect to years 2011 and 2012. (CSUMF ¶80.) Plaintiff took numerous days off under the Company's leave policy and was never disciplined for her use of that time. (CSUMF ¶¶78-79.) Plaintiff admits that Davis accommodated to desire to use FMLA time to skip the local sort duties. (CSUMF ¶13; Pl.'s Dep. 154-56, ECF No. 31-3.) With respect to the one day on which Plaintiff claims she was denied leave and was forced to come into work, the record indicates that the incident was investigated by the Department of Labor but the investigation did not result in any charge against

UPS. Viewed in its entirety, this evidence cuts against Plaintiff's theory that she was targeted for dismissal because of her use of intermittent leave.

To the extent Plaintiff has attempted to show anti-FMLA bias on the part of Ho and Crabb, the record does not support a reasonable inference that such animus influenced the decision-making process in this case. Although Ho was present at the termination meeting, he was not, by any account, a decisionmaker; rather, as Hathorn and Davis testified, Ho was present only in his capacity as a witness on behalf of management. (Hathorn Dep. 92, Pl.'s Ex. D, ECF No. 34-1; Davis Dep. 100-01, Pl.'s Ex. F, ECF No. 34-1.) To the extent that Crabb had any influence on the decisionmaking process, it was limited to the statements and photographs he provided to Davis. Crabb informed Davis, truthfully, that Plaintiff had failed to report her accident to him prior to leaving the Center on February 14, 2012. Crabb also repeated information told to him by Yoder, but there is no allegation or evidence to suggest that Crabb conveyed the information inaccurately or knew it to be false. Although Plaintiff claims that Crabb's photographs inaccurately depicted the state of the vehicle, it is undisputed on this record that Crabb became involved and took pictures only after Yoder (out of Crabb's presence) had allegedly made the damage look worse than it originally was during his inspection. There is no evidence to suggest that Crabb was aware of any inaccuracy in his photographs or that he supplied them in bad faith. Thus, the evidence in this case does not support any reasonable inference that individuals with an FMLA-related bias were instrumental in bringing about Plaintiff's termination.

In sum, there is no genuine dispute on this record that Plaintiff was involved in an "accident" on February 14, 2012 and that she failed to immediately report the accident in contravention of UPS's policy. There is also no dispute that the failure to report an accident is

considered to be an act of dishonesty for which termination is justified. Based on this record, no reasonable juror could conclude that UPS was insincere about its belief that Plaintiff violated corporate policy when she failed to report the accident. Accordingly, Plaintiff cannot demonstrate that UPS's explanation for her discharge was a pretext for unlawful retaliation, and UPS is therefore entitled to summary judgment with respect to Count I of the complaint.

Having reached this conclusion, the Court also notes that Plaintiff's termination was unsuccessfully grieved to an arbitrator who found that UPS had just cause to discharge Plaintiff. UPS argues that, consistent with the Supreme Court's counsel in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 60 (1974), this Court should give substantial weight to the arbitrator's decision denying Plaintiff's challenge to her discharge.

In *Alexander,* the Court held that a prior arbitration decision finding that an employee was discharged for just cause did not preclude the employee from asserting a Title VII claim in federal court that arose from the same set of facts. 415 U.S. at 59–60 & n. 21. Under *Alexander,* the district court must consider the plaintiff's discrimination claim *de novo*, but "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate," 415 U.S. 60, taking into account factors such as: "[1] the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, [2] the degree of procedural fairness in the arbitral forum, [3] adequacy of the record with respect to the issue of discrimination, and [4] the special competence of particular arbitrators." *Id*. at n.21. This rule has been applied as well to discrimination claims under the FMLA. *See Solovey v. Wyoming Valley Health Care System-Hospital,* No. Civ. A. 304CV2683, at *5 (M.D. Pa. May 12, 2005).

UPS argues that all of the considerations outlined in *Alexander* weigh in favor of this Court according the arbitrator's decision substantial weight. First, UPS argues that the Labor

Agreement contains expansive non-discrimination protections and provides more generous leave than is required under the FMLA itself; therefore, it conforms substantially to the requirements of both Title VII and the FMLA. (CSUMF ¶¶9-10.) Second, UPS argues that the arbitral forum provided procedural fairness because it involved a neutral arbitrator and a full and fair opportunity for Plaintiff to be heard. The arbitrator was selected by both the Union and UPS and Plaintiff was represented by an attorney as well as by a union representative at the hearing. The hearing lasted an entire day, during which time Plaintiff testified and offered evidence and also cross-examined UPS's witnesses. In addition, Plaintiff's attorney submitted a post-hearing brief which was made part of the record and considered by the arbitrator. (CSUMF ¶56.) Third, UPS argues that the issue of discrimination was adequately addressed at the arbitration because "[t]he very nature of a 'just cause' discharge arbitration is a review of the alleged discriminatory application of the employer's discipline process." (Def.'s Mem. Supp. Mot. Summ. J. 12, ECF No. 30.) UPS contends that the arbitrator's finding that Plaintiff was properly discharged under the Company's disciplinary process for failing to report an accident is strong evidence of a lack of discriminatory intent. (CSUMF ¶¶ 57-59.) Finally, UPS argues that the fourth criterion under *Gardner-Denver* is satisfied because there is no question about the competence of the arbitrator, who has over thirty years of experience in arbitration. UPS cites *Noel v. Boeing Co.,* No. 09-3613, 2011 WL 4389145 (E.D. Pa. Sept. 21, 2011) and 2011 WL 4389547, at *5 (E.D. Pa. Sept. 21, 2011); *Webb v. Merck & Co., Inc.,* 450 F. Supp. 2d 582, 604 (E.D. Pa. 2006); and *Edwards v. Merck & Co., Inc.*, No. 05-373, 2006 WL 1030281, at *3 (E.D. Pa. Apr. 18, 2006), as cases in which other courts have ruled that an arbitration award was highly probative of the absence of discriminatory intent. (*See* Def.'s Mem. Supp. Mot. Summ. J. 6, ECF No. 30 (citing cases)).

In her papers opposing the pending motion, Plaintiff contends that the results of the arbitration proceeding are inadmissible for purposes of her federal employment discrimination claims. However, she does not otherwise dispute UPS's factual assertions or attempt to distinguish the cases it cites.

Based on the Court's review of the record, it finds that the first, second, and fourth factors under *Gardner-Denver* are satisfied, but the third is questionable because it does not appear that the issue of FMLA-related discrimination (and/or gender discrimination) was specifically made a part of the arbitration proceedings. Accordingly, the Court will not give the arbitration decision substantial weight, but will simply note that it is one piece of additional evidence that arguably weighs in favor of a finding that UPS did not act with an unlawful discriminatory motive in firing Plaintiff. Even in the absence of the arbitrator's decision, however, the Court concludes that summary judgment in favor of UPS is warranted.

B. Plaintiff's Gender Discrimination Claims

Counts II and III of the complaint plead the alternative theory that UPS's stated reason for her discharge was a pretext for gender discrimination. (Compl. ¶¶ 89, 102, ECF No. 1.) Claims of pretextual gender-related discrimination follow the same *McDonnell Douglas* burden-shifting framework outlined above. *See Deans v. Kennedy House, Inc.,* 587 F. App'x 731, 734 (3d Cir. 2014).

Here again, UPS does not concede or challenge Plaintiff's ability to state a *prima facie* case and, instead, bases its motion only on the ultimate issue of pretext. As the Court has previously discussed at length, UPS satisfied its burden under the *McDonnell-Douglas*

framework of articulating a legitimate, nondiscriminatory reason for firing Plaintiff by claiming that she was discharged for dishonesty.

Plaintiff's only proffered evidence in support of her gender discrimination claim is her contention that Heitsenrether was treated more favorably after similarly failing to report an accident. As was previously discussed, Heitsenrether is not "similarly situated" to Plaintiff because, among other things, his discharge and eventual reinstatement occurred at the hands of a different decisionmaker. Plaintiff has failed to adduce any other evidence that would support the conclusion that UPS's explanation for her discharge was a fabrication and that gender related animus was more likely than not a motivating or determinative factor. *Fuentes*, 32 F.3d at 764. Consequently, her claims at Counts II and III of the complaint are insufficient as a matter of law.

## VI. Conclusion

In this Court's estimation, viewing the entirety of the evidence in the light most favorable to Plaintiff, as this Court must, there are no genuine disputes of material fact and Plaintiff has failed to adduce sufficient evidence from which a reasonable jury could conclude that the proffered non-discriminatory reason for her termination was a pretext for unlawful discrimination and unworthy of credence. Accordingly, for the reasons stated above, Plaintiff's employment discrimination claims are insufficient as a matter of law, and Defendant's motion for summary judgment will therefore be granted as to all claims in the complaint.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PENNY ANDERSON, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 3:13-135 |
| | ) |
| v. | ) |
| | ) Judge Kim R. Gibson |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER OF COURT

**AND NOW**, this 18th day of March, 2015, upon consideration of Defendant's motion

for summary judgment (ECF No. 28), and in accordance with the accompanying memorandum

opinion,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is

**GRANTED**.

**BY THE COURT**:

**KIM R. GIBSON
UNITED STATES DISTRICT JUDGE**

35